Filed 4/4/24  P. v. Gray CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASON SCOTT GRAY,<br><br>    Defendant and Appellant. | H049267<br>(Santa Clara County<br>Super. Ct. No. B1899044) |

Defendant Jason Scott Gray was convicted by jury of forcible sodomy, forcible rape, forcible oral copulation, forcible sexual penetration, and misdemeanor possession of methamphetamine.  He was sentenced to 24 years in prison, including aggravated terms on the four sexual assault counts, and ordered to pay various fines and fees.  On appeal, he contends the prosecutor committed misconduct in closing argument and defense counsel was ineffective for failing to object.  He also argues he is entitled to resentencing under Senate Bill No. 567 (2021–2022 Reg. Sess.) and vacatur of a criminal justice administration fee under Assembly Bill No. 1869 (2019–2020 Reg. Sess.).  We will uphold defendant's convictions and remand the matter for resentencing.

## I.    TRIAL COURT PROCEEDINGS

### A.  TRIAL EVIDENCE

The events described at trial occurred in 2018.  Defendant lived in an apartment with his mother, and defendant's sister lived next door with her daughters.  One of her daughters, referred to here and at trial as Sophia Doe to protect her privacy (see

California Rules of Court, rule 8.90, subdivision (b)(4)), was 18 years old at the time. Defendant was in his forties and was bigger and stronger than Doe. Doe saw defendant almost every day, and he regularly drove her to school and work. The two were friendly and sometimes smoked marijuana together.

Following an argument with her mother (defendant's sister), Doe moved out of her mother's apartment and moved in with her grandmother (defendant's mother). Defendant was not there when Doe moved in, and defendant's mother had changed the locks. Defendant's mother went out of town shortly after Doe moved in. She told Doe to keep the door locked and not let defendant inside.

A few days later, Doe forgot to lock the door and defendant let himself inside the apartment. Defendant told Doe that his mother had given him permission to be there, and she believed him. Doe described that she and defendant were "hang[ing] out" that night "just like normal." She recalled they probably smoked marijuana. Defendant also showed Doe methamphetamine, which she had never tried before. Defendant smoked some crystal methamphetamine, and Doe "did a line" of powdered methamphetamine. It made her "really tired," which confused her because she thought methamphetamine would have the opposite effect. She went to sleep in her grandmother's room.

Defendant's mother returned from her trip the next day. She went to sleep in her room around 9:00 or 10:00 that night; she took sleeping pills every night and slept very soundly. After her grandmother went to sleep, Doe asked defendant if he wanted to smoke marijuana, which they did in defendant's room because they were not allowed to smoke in the living room. They also smoked methamphetamine. The methamphetamine made Doe tired again and defendant told her, " 'Maybe you're just not taking enough.' " She smoked more and then lay down on a mattress defendant put in the living room for her.

While Doe was lying face down on the mattress, defendant sat in a chair next to her. He started rubbing her back and told her she would be okay. Defendant at first

2

seemed to be comforting Doe, but he then moved his hand down to her buttocks. Doe froze up and felt like she could not move, speak, or "do anything."

Doe was wearing a bra, underwear, a shirt, and basketball shorts. A blanket was covering her. Defendant removed the blanket and started touching Doe's vagina through her clothes. He got on top of Doe and started "dry humping" her. After removing Doe's shorts and underwear, defendant penetrated her vagina with his fingers. Doe's legs were closed until defendant opened them. Defendant touched Doe's vagina with one hand while pressing down on the back of her head with his other hand.

Defendant removed his pants and inserted his penis into Doe's anus. Feeling a lot of pain, Doe whispered " 'no' " but was not sure if defendant heard her. (Doe did not say anything else during the encounter.) Defendant told Doe, " 'You're going to be okay.' " He asked her to "roll over" but she did not move, so he rolled her onto her back. Defendant put his mouth and tongue on her vagina. He then inserted his penis into her vagina multiple times.

At some point during the encounter, defendant told Doe she was beautiful like her mother. Defendant said, " 'I'm about to come' " while his penis was inside Doe's vagina. He pulled his penis out of Doe's vagina and asked her if she was mad at him. She did not respond. When defendant left the room to change his clothes, Doe got dressed and ran out of the apartment.

Doe called her then-boyfriend and asked him to pick her up, which he did. Doe and her boyfriend were not sexually active and she was a virgin at the time. She had never been "flirty" with defendant or "done anything sexual" with him, and found the idea "gross." When Doe's boyfriend picked her up, she was crying and told him that her uncle had sexually assaulted her. Doe's boyfriend took her to his house, where she spoke to his mother. Her boyfriend's mother suggested that Doe go to the hospital, and she reluctantly agreed. Doe was still in pain and was bleeding from her anus and vagina.

3

A nurse at the hospital called police after Doe told her what happened. One of the responding officers testified that he could tell Doe "had been crying" because "her eyes were still kind of bloodshot" and had red marks underneath them. He recalled Doe "was pretty somber" and "wasn't really enthusiastic about talking" with police, although she did. Police drove Doe to another medical facility, where she underwent a Sexual Assault Response Team (SART) exam.

The SART nurse testified "as an expert in forensic nursing, including the collection and preservation of evidence of sexual assaults, and in the determination of whether a patient's injuries are consistent with their history of sexual assault." In the nurse's opinion, Doe's injuries were consistent with her report of a nonconsensual sexual assault. Doe's injuries included a red spot on her throat, "a very red blood oozing injury" and "significant bleeding laceration" in her genital area, and "multiple splits" at the "anal verge," which the nurse described as "the wrinkling part of the opening to the rectum." A hair not belonging to Doe was also found inside her labia. The SART exam was conducted roughly seven hours after the alleged assault, by which point "open bleeding" would typically have subsided, but Doe was still bleeding significantly. The nurse had seen patients with similar injuries from consensual sex, "but not quite to this extent." Doe told the nurse, " 'I tried to push him off. I pushed him—I pushed against his forearm.' "

The next day, Doe's older sister drove her to the police station. Doe had an anxiety attack and vomited in her sister's car. At the station, Doe spoke to a detective about what had happened. She told him that "her legs were closed" while she was lying on her stomach but defendant "was trying to spread them apart." Doe also told the detective that defendant had kissed and licked "her butt and her back." She "said she wiggled and moved a lot" when defendant inserted his penis into her anus, and that she said "no" and shook her head around the same time. The detective's report referenced

4

Doe's account of defendant saying, " 'I am about to come' "; " 'you're so wet' "; and " 'it feels so good' " during the encounter.

Doe's sister told police defendant would be at her grandmother's apartment. She then went to the apartment while Doe stayed at the police station. Defendant was at the apartment and asked Doe's sister where Doe was. Doe's sister got in her car to leave, but defendant "jumped into the car" and told her to drive. Police stopped the car and arrested defendant. A black bag found on the passenger seat contained items including defendant's wallet, methamphetamine, and drug paraphernalia.

A test of Doe's blood was positive for methamphetamine. Semen was not found on swabs taken from Doe's anus and vagina. A small amount of male DNA was found, but it was insufficient for testing. A swab taken from Doe's back also contained a small amount of male DNA, most likely from saliva. The sample appeared to contain a mixture of DNA from multiple people and could not be used to identify a particular individual. DNA testing could not establish whether defendant's DNA was present or not present on Doe.

### B. CLOSING ARGUMENT

It appears from the record that due to a mechanical failure, no reporter's notes exist for the prosecutor's closing argument which is therefore not included in the reporter's transcript; defense counsel's closing argument and the prosecutor's rebuttal do appear in the transcript. In lieu of a transcript, the trial court has provided us with a settled statement concerning the prosecutor's closing argument. Attached to the settled statement are images and text from a digital slideshow that the prosecutor presented to the jury during her closing argument. Certain slides are accompanied by associated notes not shown to the jury, but spoken by the prosecutor "almost verbatim" in her presentation. The prosecutor's presentation consisted of 42 slides. Defense counsel did not object to any aspect of the prosecutor's argument.

5

Slide No. 3 contains a picture of Doe. It is accompanied by notes reading in part, " 'I remember when he put his penis inside… it hurt so bad' [¶] 'I remember saying no no no and he just was like its okay, your [*sic*] okay' [¶] 'I told him no. I remember saying no.' [¶] No means NO [¶] 'no, this isn't happening to me. I know this isn't happening' [¶] Statements made by [Doe] to describe what can only be described as the worst night of her life [...] [¶] Pain is still there… you saw it. Her testimony was hard, hard to hear, hard to see, feel her pain she was raw, she was honest and she was brave."

Slide No. 38 also contains a picture of Doe. It is accompanied by notes reading in part, "Saw her, heard her—run off the witness stand crying. [¶] [Doe] was a virgin… think she wanted this for her first time… wanted this nightmare. [¶] Waited, didn't have sex with your boyfriend… wait for this? [¶] You saw her, remember when she ran out of here. [¶] Talk about her 1st sexual experience in that fashion … in front of strangers and a judge, and a woman talking [*sic*] down everything you say. Who on earth wants that? [¶] Use your common sense[.]"

Slide No. 39 reads, "In this case, there is no other <u>reasonable interpretation</u> of the evidence except that the defendant is guilty as charged[.]" The slide is accompanied by notes reading, "WITH CHOICES ARE CONSEQUENCES [¶] DEFENDANTS CHOOSE TO COMMIT THESE CRIMES[.]"

Slide No. 40 contains another picture of Doe. It also includes text reading "Defendant is <u>Guilty</u> of All Counts". It is accompanied by notes reading in part, "We all want to think someone who would rape and sodomize are somehow identifiable by how they look or act. We want to think that we can spot danger and protect ourselves from it. We want them to be the guys in ski masks who look scary. Or unkempt, dirty, creepy. But think about it, in order to commit these crimes, the molester[] must lure in his victims and make them feel safe. [¶] Truth is, often the abuser is someone the victim knows."

Slide No. 41 contains a quote attributed to Theodore Roosevelt: " 'No man is above the law and no man is below it; nor do we ask any man's permission when we ask

6

him to obey it.  Obedience to the law is demanded as a right; not asked as a favor[.]' "
The next and final slide, No. 42, is blank.

Defense counsel argued that defendant reasonably believed the sex was consensual.  He also discussed the prosecution's burden of proving defendant guilty beyond a reasonable doubt.  In her rebuttal, the prosecutor noted, "First of all, remember that the burden, which I've always said is on me, and it's proof beyond a reasonable doubt.  Proof that leaves you with an abiding conviction the charge is true."

### C. SENTENCING

Defendant was found guilty as charged.  The trial court sentenced defendant to 24 years in prison, consisting of the upper term of eight years for forcible sexual penetration as the principal count, fully consecutive upper terms of eight years on the rape and sodomy counts, and a concurrent upper term of eight years for forcible oral copulation.  In selecting the aggravated terms, the court considered five factors:  the victim's particular vulnerability; defendant's use of a position of trust or confidence to commit the offenses; defendant's numerous prior convictions as an adult; defendant's prior prison term; and defendant's previous unsatisfactory performance on probation or parole.  The court also considered "as a potential mitigating factor" defendant's participation in substance abuse treatment programs while in custody.  Defendant was also sentenced to a concurrent 30-day term on the misdemeanor methamphetamine possession count and ordered to pay various fines and fees, including a $129.75 criminal justice administration fee.

## II.    DISCUSSION

### A. COUNSEL'S PERFORMANCE WAS NOT INEFFECTIVE

Defendant contends he received ineffective assistance from trial counsel, who did not object to the prosecution's statements during closing argument.  He argues the prosecutor misstated the burden of proof, misstated Doe's testimony, referenced facts not in evidence, and improperly appealed to the jury's sympathies and values.  We see

7

nothing improper in the portion of the prosecutor's presentation discussing the burden of proof. Even assuming other portions of the prosecutor's closing argument were objectionable, defense counsel may have made a tactical choice not to object, and defendant was not prejudiced in any event.

To establish ineffectiveness of trial counsel in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) Deficient performance is rarely shown if there was a tactical reason for trial counsel's conduct. (See *People v. Cruz* (1980) 26 Cal.3d 233, 255–256 ["except in rare cases, an appellate court should not attempt to second-guess trial counsel as to tactics"]; *People v. Bolin* (1998) 18 Cal.4th 297, 317 [affirming conviction when alleged failure to object "may well have been 'an informed tactical choice within the range of reasonable competence' "].) Because "the decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one" (*People v. Padilla* (1995) 11 Cal.4th 891, 942), failure to object is rarely a basis for a finding of deficient performance. (*People v. Lopez* (2008) 42 Cal.4th 960, 972.) And to establish prejudice, a defendant must affirmatively show a reasonable probability that, but for trial counsel's errors, the result would have been different. (*Ledesma*, 43 Cal.3d at pp. 217–218.)

### 1. Statements Regarding the Standard of Proof

Defendant cannot show that trial counsel was deficient for not objecting to the content of slide No. 39, which reads, "In this case, there is no other <u>reasonable interpretation</u> of the evidence except that the defendant is guilty as charged[.]" The statement does not suggest a lesser standard of proof than beyond a reasonable doubt, nor that the jury need only find the prosecution's theory of the case "reasonable" in order to find defendant guilty. It simply urges the jury to accept the prosecution's interpretation

8

of the evidence as reasonable and to reject any unreasonable interpretation.  And it is consistent with the court's instruction regarding the use of circumstantial evidence: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Defendant's reliance on *People v. Centeno* (2014) 60 Cal.4th 659 is misplaced.  In *Centeno*, the prosecutor "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt" and "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence." (*Id.* at p. 673.)  Here, by contrast, the prosecutor clearly and consistently stated both elsewhere in her main presentation and in her rebuttal argument that the prosecution bore the burden of proving defendant's guilt beyond a reasonable doubt.  To that she added a single slide urging the jury to reject unreasonable interpretations of the evidence inconsistent with defendant's guilt.  Even if potentially conflicting when viewed in isolation, the slide does not rise to the level of prosecutorial misconduct "because in the context of the entire argument and jury instructions it was not reasonably likely the jury understood or applied the statement in an improper or erroneous manner." (*People v. Meneses* (2019) 41 Cal.App.5th 63, 73.)  "Nothing in the prosecutor's explanation lessened the prosecution's burden of proof.  The prosecution must prove the case beyond a reasonable

9

doubt, not beyond an unreasonable doubt." (*People v. Romero* (2008) 44 Cal.4th 386, 416.) Defense counsel thus cannot be faulted for not objecting to these points.

## 2. Statements Regarding Doe's Testimony and Demeanor

Without a transcript of the prosecutor's closing argument, we recognize the possibility that the prosecutor may have misstated Doe's testimony. Slide No. 3 is accompanied by notes consisting of statements purportedly made by Doe. Defendant notes that two of those statements—" 'I remember saying no no no and he just was like its okay, your [*sic*] okay' " and " 'I told him no. I remember saying no' "—were not in evidence at trial. The Attorney General does not appear to dispute defendant's assertion, instead relying on language from the settled statement to suggest the prosecutor's "almost verbatim" reading of her notes to the jury may not have included those statements. Assuming the prosecutor did misstate Doe's testimony, as seems likely, that was misconduct. It is "well settled" that basing argument on facts not in evidence constitutes misconduct. (*People v. Mendoza* (2016) 62 Cal.4th 856, 906 (*Mendoza*).) But because the challenged statements are generally consistent with Doe's transcribed testimony, defense counsel may have reasonably determined that objecting would merely underscore Doe's actual statements without yielding any meaningful strategic benefit.

We do not read the notes accompanying slide No. 3 as prejudicial to defendant. It is clear that Doe testified she told defendant " 'no' " while he was sexually assaulting her and defendant then told her, " 'You're going to be okay.' " She repeatedly and consistently acknowledged that she did not say anything else to defendant during the assault. Given Doe's testimony, it is unlikely the jury would conclude from the prosecutor's presentation that Doe told defendant "no" multiple times. It is also unlikely the jury would interpret the prosecutor's statement "No means NO"—which defendant agrees is an accurate quote drawn from Doe's trial testimony—as something Doe said to defendant during the assault. That interpretation would be inconsistent with other

10

testimony from Doe, and also with the prosecutor's presentation which clearly referred to the assault in the past tense.

Defendant also objects to the prosecutor's characterization of Doe's demeanor while testifying: "Pain is still there… you saw it. Her testimony was hard, hard to hear, hard to see, feel her pain she was raw, she was honest and she was brave." Defendant contends the description was an improper appeal to the jury's sympathies, and he raises the same objection to a portion of the prosecutor's notes accompanying slide No. 38: "Saw her, heard her—run off the witness stand crying. [¶] [Doe] was a virgin… think she wanted this for her first time… wanted this nightmare. [¶] Waited, didn't have sex with your boyfriend… wait for this? [¶] You saw her, remember when she ran out of here. [¶] Talk about her 1st sexual experience in that fashion … in front of strangers and a judge, and a woman talking [*sic*] down everything you say. Who on earth wants that? [¶] Use your common sense[.]"

A prosecutor may not vouch for the credibility of a witness by referring to evidence outside the record but may mention the " 'apparent honesty or reliability' " of the witness based on facts in the record or reasonable inferences drawn from those facts. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 39.) In assessing the credibility of a witness, the jury is permitted to consider a witness's demeanor while testifying, the character of the testimony, and the attitude of the witness toward the case or "toward the giving of testimony." (Evid. Code, § 780, subds. (a), (b), (j).) It was therefore not improper for the prosecutor to argue that the circumstances surrounding Doe's testimony reflected favorably on her credibility. The prosecutor's notes reflect fair commentary applying permissible factors and do not imply the prosecutor had access to facts not known to the jury. Here again, even if we were to assume these portions of the prosecutor's presentation exceeded the scope of Evidence Code section 780, defense counsel could have reasonably decided that an objection would simply appear combative to the jury without actually diminishing the effect of the prosecutor's argument.

11

### 3. Statements Beyond the Evidence

Slide No. 39 (which contains the "reasonable interpretation" language that we have concluded did not lower the prosecution's burden or misstate the standard of proof) is accompanied by notes reading, "WITH CHOICES ARE CONSEQUENCES [¶] DEFENDANTS CHOOSE TO COMMIT THESE CRIMES[.]" Defendant argues the statement "DEFENDANTS CHOOSE TO COMMIT THESE CRIMES" imputes guilt to "defendants" as a class and by extension to defendant as a member of that class. The prosecutor's reason for using the plural "defendants" in her notes is unclear from the record. The phrase may have related to a different case (as did other references in the prosecutor's notes with the name of a victim other than Doe), and the plural construction may not have actually been spoken to the jury. But even assuming the notes were read to the jury verbatim, we see no reasonable probability that the jury would have interpret use of the plural as suggesting defendant should be found guilty based solely on being charged with a crime. Given the prosecutor's consistent acknowledgment of having the burden of proof, it is far more likely that the jury would interpret the word choice as an isolated misstatement.

More problematic are the notes accompanying slide No. 40 reading, "We all want to think someone who would rape and sodomize are somehow identifiable by how they look or act. We want to think that we can spot danger and protect ourselves from it. We want them to be the guys in ski masks who look scary. Or unkempt, dirty, creepy. But think about it, in order to commit these crimes, the molester[] must lure in his victims and make them feel safe. [¶] Truth is, often the abuser is someone the victim knows." Assuming those notes were read to the jury, they improperly refer to facts not in evidence regarding the frequency of sexual abuse committed by a perpetrator that a victim knows. (See *Mendoza*, *supra*, 62 Cal.4th at p. 906; see also *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084–1088 ["profile evidence" can be prejudicial under certain circumstances].) But defense counsel, having conceded defendant's involvement in the

12

sexual encounter in order to argue the encounter was consensual, may have assessed the statement as insufficiently damaging to warrant objection, or may have refrained from objecting to downplay the implication that sexual abuse occurred in this case. Given Doe's uncontroverted testimony about the details of the encounter and the nature of her relationship with defendant, a result more favorable to defendant is improbable even if defense counsel had objected and the jury had been instructed to disregard the prosecutor's commentary.

### 4. Statements Quoting Theodore Roosevelt

Defendant contends the final substantive slide of the prosecutor's presentation was an improper appeal to the jury's sense of patriotism and community values using a quotation from Theodore Roosevelt: " 'No man is above the law and no man is below it; nor do we ask any man's permission when we ask him to obey it. Obedience to the law is demanded as a right; not asked as a favor[.]' " We acknowledge that appeals to outside authority should be avoided, but we do not believe the prosecutor's use of the quotation here rose to the level of misconduct or prejudiced defendant. As the Supreme Court found in *People v. Mayfield* (1997) 14 Cal.4th 668, 803–804, the "[a]ppeal to patriotism was not a significant theme of the argument, nor was the argument reasonably likely to inflame the passions of any juror or to cause any juror to disregard defendant's individuality and to view him merely as a symbol or personification of society's criminal element." Within the context of the prosecutor's argument, we view the quotation merely as a permissible means of exhorting the jury to faithfully apply the law and determine defendant's guilt based on the evidence. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 894–895.)

Many portions of the prosecutor's presentation to which defendant now objects do not constitute misconduct. To the extent that other portions may have been objectionable, we see no reasonable probability that they affected the outcome. Nor was any misconduct, even cumulatively, so pervasive as to deprive defendant of a fair trial.

13

(See *People v. Fuiava* (2012) 53 Cal.4th 622, 692.) And as we have explained, for largely the same reasons that the prosecutor's argument did not prejudice defendant, it would be a reasonable tactical decision by defense counsel to let the argument pass without objection. We therefore reject defendant's claim of ineffective assistance.

## B. DEFENDANT IS ENTITLED TO THE BENEFIT OF SENATE BILL NO. 567

After defendant was sentenced, the Legislature amended Penal Code section 1170 to allow an aggravated prison term to be imposed only if the aggravating factors supporting it are admitted by the defendant or found true by a jury. (Stats. 2021, ch. 731, § 1.3.) As an ameliorative change, that legislation applies retroactively to this case that is not yet final on appeal. (*In re Estrada* (1965) 63 Cal.2d 740, 747.) Defendant was sentenced to an aggravated term on each of the four sexual assault counts. He seeks resentencing under the new standards because he did not admit the aggravating facts relied on by the court nor did a jury find them true.

Intermediate appellate courts are divided regarding the standard for determining prejudice in this situation, and the issue is pending before the California Supreme Court. (See, e.g., *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [remand not required if appellate court concludes beyond a reasonable doubt that jury would have found at least one aggravating factor true]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 466–467 [if appellate court does not conclude beyond a reasonable doubt that jury would have found *all* aggravating factors true, but concludes beyond a reasonable doubt that some factors would have been found true, remand is required if it is reasonably probable a lesser sentence would have been imposed based on only those factors]; *People v. Dunn* (2022) 81 Cal.App.5th 394, 409–410, rev. granted Oct. 12, 2022, S275655 [if appellate court concludes beyond a reasonable doubt that at least one aggravating factor would have been found true, but finds reasonable probability that any other aggravating factors relied on in imposing sentence would not have been found true, it must assess likelihood of lesser sentence being imposed absent factors not meeting that standard]; *People v. Lewis*

14

(2023) 88 Cal.App.5th 1125, 1137–1138, rev. granted May 17, 2023, S279147 [remand not required if appellate court concludes beyond a reasonable doubt that jury would have found at least one aggravating factor true and record clearly indicates trial court would have imposed the same sentence under the new law]; see also *People v. Ross* (2022) 86 Cal.App.5th 1346, 1354, rev. granted Mar. 15, 2023, S278266 [rejecting the reasoning of *Flores* in favor of the *Lopez* test].)

We agree with the majority of published opinions that prejudice can be shown even if at least one aggravating factor would have been found true beyond a reasonable doubt. In our view the proper approach is to determine which aggravating factors relied on by the trial court would have been found true beyond a reasonable doubt if decided by the jury, and then to assess the probability of a different sentence had the trial court been limited to considering only those aggravating factors.

The trial court relied on five aggravating factors to impose upper term sentences. Under amended Penal Code section 1170, one of those factors—defendant's prior convictions—may be considered by a trial court based on certified records of conviction without being submitted to a jury. (Pen. Code, § 1170, subd. (b)(3).) Two others— defendant's prior prison term and previous parole or probation violations—are factors that would have been found true beyond a reasonable doubt if decided by a jury, as there is no apparent dispute as to those facts. But whether the victim was "particularly vulnerable" (Cal. Rules of Court, rule 4.421(a)(3)), and whether defendant "took advantage of a position of trust or confidence to commit the offense" (*Id.*, rule 4.421(a)(11)), are more subjective determinations. On this evidentiary record we cannot say beyond a reasonable doubt that the jury would have adopted those characterizations. We must decide the likelihood that the trial court would have imposed the upper term on all four counts without considering Doe's vulnerability or defendant's exploitation of trust or confidence. Given the weight of those factors in the sentencing calculus, we find it reasonably probable the court would have imposed a lesser sentence

15

had it considered only defendant's prior record.  We will therefore remand for resentencing for the trial court to apply the current version of Penal Code section 1170, subdivision (b)(2).

### C. A CRIMINAL JUSTICE ADMINISTRATION FEE IS NO LONGER AUTHORIZED

The parties correctly agree that the $129.75 criminal justice administration fee imposed as part of the sentence is invalid and must be vacated.  Under Assembly Bill No. 1869, effective July 1, 2021, the criminal justice administration fee is no longer statutorily authorized.  (Stats. 2020, ch. 92, § 24.)  On resentencing no criminal justice administration fee may be imposed.

## III.    DISPOSITION

The judgment is reversed and the matter is remanded for resentencing.  On remand, the prosecution may elect to proceed by meeting the requirements of Penal Code section 1170, subdivision (b)(2) regarding aggravating circumstances or may elect to proceed on the current record.  After the prosecution makes that election, the trial court shall resentence defendant according to current law.

_____
Grover, J.

**WE CONCUR:**


_____
Greenwood, P. J.




_____
Lie, J.


H049267
*People v. Gray*